# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** } | |
| } | |
| **v.** } | Case No.: 2:15-cr-00077-MHH-SGC |
| } | |
| **MAURICE RILEY,** } | |
| } | |
| Defendant. } | |

## MEMORANDUM OPINION AND ORDER

Defendant Maurice Riley's case began in the United States District Court for the District of New Jersey. In 2001, a jury there convicted Mr. Riley of one count of conspiracy to distribute cocaine and crack cocaine. The New Jersey District Court sentenced Mr. Riley to prison for 210 months. Upon release from prison on February 19, 2013, Mr. Riley began a five-year term of supervised release. Later in 2013, Mr. Riley moved to Alabama, and the United States Probation Office for the Northern District of Alabama began supervising Mr. Riley. Effective January 26, 2015, this Court formally accepted jurisdiction from the District of New Jersey over Mr. Riley's supervised release. Mr. Riley's term of supervised release is scheduled to end on February 19, 2018.

This opinion concerns the United States Probation Office's request that the Court add a special mental health condition to the terms of Mr. Riley's supervised

release and the United States's request that the Court determine Mr. Riley's mental competency pursuant to 18 U.S.C. § 4241.

For the reasons discussed below, the Court finds that Mr. Riley suffers from a mental disease or defect, but he is not mentally incompetent under 18 U.S.C. § 4241. Therefore, the Court grants the United States Probation Office's request to add a special mental health condition to the terms of Mr. Riley's supervised release but orders no further competency proceedings at this time.

**I.     Findings of Fact**

1.     On December 3, 2001, a jury in the United States District Court for the District of New Jersey convicted Mr. Riley of one count of conspiracy to distribute cocaine and crack cocaine. (Doc. 1, p. 2). After serving a 210 month sentence, Mr. Riley left prison on February 19, 2013 and began serving a five-year term of supervised release. (Doc. 2, p. 1).

2.     On January 8, 2015, the District of New Jersey entered an order for transfer of jurisdiction over Mr. Riley's supervision from that district to the Northern District of Alabama. On January 26, 2015, the Court signed the order accepting jurisdiction over Mr. Riley's supervised release effective January 26, 2015. (Doc. 1).[1]

---

[1] The order was not docketed on the Clerk's record until March 30, 2015. (Doc. 1).

3.      On March 30, 2015, Matthew Worboys, the United States Probation Officer who supervised Mr. Riley, asked the Court to schedule a supervised release revocation hearing to consider two alleged violations of the conditions of Mr. Riley's supervised release. (Doc. 2). Condition 6 of Mr. Riley's supervised release requires Mr. Riley to "answer truthfully all questions by the probation officer and follow the instructions of the probation office." (Doc. 2, p. 2; *see also* Doc. 1, p. 5).[2] According to the petition, Mr. Worboys instructed Mr. Riley not to have contact with his (Mr. Riley's) former girlfriend without Mr. Worboys's permission, and on March 1, 2015, March 15, 2015, and March 18, 2015, Mr. Riley had contact with his former girlfriend without Mr. Worboys's permission. (Doc. 2, p. 2). The petition also states that on September 29, 2014, Mr. Worboys instructed Mr. Riley "to only become employed with trucking companies that have local routes within a 250-mile radius of Northern Alabama," and on March 10, 2015, Mr. Riley told Mr. Worboys that he worked for a "trucking company as a driver, operating within a 500-mile radius, and had recently made deliveries" to Ohio, which is outside a 250-mile radius of the Northern District of Alabama. (Doc. 2, p. 2).

---

[2] The petition states that Mr. Riley violated Condition 4. However, Condition 4 instructs Mr. Riley not to leave the district without the permission of the court or the probation officer. Condition 6 mirrors the language used in Mr. Worboys's description of the alleged violations. Therefore, the Court presumes that Mr. Worboys's reference to Condition 4 is a typographical error. (*Compare* Doc. 1, p. 5 *with* Doc. 2, p. 2).

4. On April 2, 2015, Mr. Worboys filed a motion to withdraw his March 30, 2015 petition. (Doc. 6). In his April 2, 2015 filing, Mr. Worboys explained that since filing the petition on March 30, 2015, the probation office had discovered information that led Mr. Worboys to believe that Mr. Riley might be suffering from a mental health condition that may have contributed to Mr. Riley's alleged violations of the conditions of his supervised release. (Doc. 6, p. 1). Mr. Worboys asked the Court to proceed with the hearing that the Court had set for April 8, 2015 to consider whether the Court should add special conditions to Mr. Riley's supervised release that would require Mr. Riley to undergo a mental health evaluation and to participate in a mental health treatment program. (Doc. 6, p. 1).

5. The Court granted the motion to withdraw the March 30, 2015 petition. (Doc. 7).

6. On April 2, 2015, Mr. Worboys filed a request for a hearing to modify the conditions or terms of Mr. Riley's supervision. (Doc. 8). Mr. Worboys asked for the modification to Mr. Riley's supervised released because:

> Mr. Riley has allegedly violated conditions of his supervised release by having direct or indirect contact with a Brenda Davis, on several occasions, without permission of the probation officer. [Mr. Riley] believes Ms. Davis may be held against her will, and that is the reason she is avoiding him. The probation office has evidence to show that Ms. Davis discontinued her relationship with Mr. Riley in December 2014, and she is not being held against her will. She simply does not want any relationship with Mr. Riley, and he does not understand that. Mr. Riley has had contact with law enforcement personnel under

>supervised release, and they have advised that he may be suffering from a mental health condition. The probation office has obtained records from the Bureau of Prisons that support he was diagnosed with, and treated for, a mental health condition while serving his custodial sentence in this case. Furthermore, on March 30, 2015, Mr. Riley received a mental health screening by Senior U.S. Probation Officer John Gurley, Mental Health Specialist. According to Officer John Gurley, Riley is suffering from a psychotic episode and is in need of an evaluation and stabilization.

(Doc. 8, p. 2). The Court scheduled Mr. Worboys's request to modify the conditions of Mr. Riley's supervised release for hearing. (Doc. 9).

7. On April 8, 2015, the government filed a motion for a determination of mental competency pursuant to 18 U.S.C. § 4241(a). (Doc. 10). The government asked the Court to conduct a hearing to determine Mr. Riley's competency. (Doc. 10, p. 2).

8. The Court held a hearing on the government's motion and the probation office's modification petition on April 8, 2015. Mr. Worboys, Mr. Gurley, and Mr. Riley testified during the hearing. Mr. Worboys testified that in his opinion, a mental health condition may have contributed to Mr. Riley's alleged violations of his conditions of supervised release. (April 8, 2015 Tr. p. 5). Mr. Worboys based his opinion in part on records that Mr. Worboys received from the

Federal Medical Center in Rochester, Minnesota (FMC Rochester), where Mr. Riley served the final part of his custodial sentence.[3]

9. Mr. Gurley, a mental health specialist for the probation office in the Northern District of Alabama, met with Mr. Riley for 45 minutes on March 30, 2015. Based on this 45-minute meeting, Mr. Gurley testified that he believed that Mr. Riley was delusional. (April 8, 2015 Tr. pp. 8, 13). According to Mr. Gurley, Mr. Riley discussed with him "a conspiracy that was going on in the state of Alabama that involved the Justice Department, the DEA, CIA, in which Brenda Davis, his ex-girlfriend, and up to a hundred other women have their lives in jeopardy. [Mr. Riley] [s]aid he was on a mission to save them, that time was of the essence. He also said the Bureau of Prisons was involved in a scheme to kidnap people in the community and swap them out with people that are in custody." (April 8, 2015 Tr. p. 14). Mr. Gurley testified that Mr. Riley "was quite agitated, was respectful, but he clearly believe[d] those thoughts." (April 8, 2015 Tr. p. 14).

---

[3] According to Mr. Worboys, those records indicated that the institution dismissed certain disciplinary charges against Mr. Riley due to Mr. Riley's mental health. Mr. Worboys contacted the mental health specialists at FMC Rochester who shared some of Mr. Riley's medical records with Mr. Worboys. Mr. Worboys noted that in April 2008, a district court judge in the United States District Court for the District of Minnesota found that Mr. Riley was suffering from a mental disease or defect and committed Mr. Riley to the custody of the Attorney General for psychiatric treatment and evaluation. (April 8, 2015 Tr. pp. 7-8).

Over Mr. Riley's objection, the Court accepted as an exhibit to the April 8, 2015 hearing the BOP medical records from FMC Rochester that Mr. Worboys reviewed. The records are sealed in the Court record. Because Mr. Riley believes that the records are fraudulent, the Court has not relied on those records in evaluating Mr. Riley's competency.

Mr. Gurley testified that he reviewed papers that Mr. Riley delivered to the United States Attorney's Office in Birmingham prior to the hearing.[4] (April 8, 2015 Tr. p. 16).

10. Mr. Riley testified that he moved to Alabama in 2013 to work for his uncle's trucking business. Mr. Riley lives with his aunt and uncle in Toney, Alabama. (April 8, 2015 Tr. pp. 31-32, 38). Eventually, Mr. Riley bought his own truck. (April 8, 2015 Tr. p. 37). He hauls large steel coils. In addition to his work as a truck driver, Mr. Riley told the Court that he leads Bible studies on the weekends. (April 8, 2015 Tr. p. 38).

11. Mr. Riley participated extensively in the April 8, 2015 hearing. He explained his relationship with Mr. Worboys. (April 8, 2015 Tr. pp. 34-35). He challenged Mr. Worboys's contention that he (Mr. Riley) had violated the conditions of his release. Mr. Riley described the sequence of events that led to his involuntary psychiatric treatment at FMC Rochester. (April 8, 2015 Tr. p. 23-25).[5]

---

[4] The Court accepted this packet of information as Government's Exhibit 1. The information contains a three-page notarized affidavit and several exhibits. Because the material contains personal identifying information of third parties, the Court has sealed the exhibit in the record.

[5] Mr. Riley had an altercation with a number of prison officers and "slung" one of the officers. The officer fell and broke his arm. (April 8, 2015 Tr. pp. 25-26). According to Mr. Riley, the other officers forced him to the concrete floor and cut his face. (April 8, 2015 Tr. p. 25). Mr. Riley believes that FMC Rochester officials and doctors fabricated medical records and diagnosed him with a mental illness in retaliation for breaking the officer's arm. (April 8, 2015 Tr. p. 29).

Mr. Riley described a civil lawsuit that he has filed in the Northern District of Alabama in which he disputes the validity of the FMC Rochester records. (April 8, 2015 Tr. p. 50; *see also* Doc. 1 in Case No. 5:15-cv-00587-CLS).[6]

12.   Mr. Riley also explained the affidavit and exhibits that he delivered to the United States Attorney's Office before the competency hearing. (April 8, 2015 Tr. p. 31). Mr. Riley understood that he had to have his affidavit notarized and explained that he could locate notaries at a bank or credit union. (April 8, 2015 Tr. p. 41). The affidavit concerns Mr. Riley's former girlfriend, Ms. Davis. Mr. Riley testified that the last time he saw Ms. Davis, "somebody was following her." (April 8, 2015 Tr. p. 48). Mr. Riley wanted to help Ms. Davis, but he knew he would get into trouble because Mr. Worboys had instructed him not to have contact with Ms. Davis. Mr. Riley met with the sheriff's department and explained that Ms. Davis would "disappear" and "nobody is going to see her again." (April 8, 2015 Tr. p. 48).

---

[6] The Court accepted as Defendant's Exhibit 1 one page of Mr. Riley's complaint in that civil action. The civil action is styled *Maurice Riley v. Daniel Shine*, Case No. 5:15-cv-00587-CLS. The electronic record is available on CM/ECF, this Court's electronic docketing system. The Court takes judicial notice of the record in that case. *See Horne v. Potter*, 392 Fed. Appx. 800, 802 (11th Cir. 2010) (district court properly took judicial notice of documents related to the plaintiff's previous civil action because the documents "were public records that were 'not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'") (quoting Fed. R. Evid. 201(b); other internal citations omitted). The Court has not relied on the medical records that Mr. Riley attached to his complaint in that action because Mr. Riley disputes the validity of those records.

13. After Mr. Riley's counsel finished questioning him during the April 8, 2015 hearing, Mr. Riley reminded his attorney about other relevant testimony that Mr. Riley wished to place on the record regarding his understanding of how far he could travel outside of the Northern District for work. (April 8, 2015 Tr. pp. 36-37). Mr. Riley also told the Court that he understood that this Court, and not a New Jersey court, had jurisdiction over his case now because Mr. Riley lives in the Northern District of Alabama. (April 8, 2015 Tr. p. 52).

14. Based on the information that the Court received during the April 8, 2015 hearing, the Court found that there was reasonable cause to believe that Mr. Riley might be suffering from a mental illness. (Doc. 11, p. 1). On April 17, 2015, pursuant to 18 U.S.C. § 4247(b), the Court committed Mr. Riley to the custody of the Attorney General for hospitalization in a federal medical center not located in Minnesota or Georgia for a psychiatric or psychological examination to determine whether Mr. Riley is mentally ill. (Doc. 11, p. 1).

15. Between May 6, 2015 and June 19, 2015, Dr. Dia Boutwell, Ph.D., ABPP evaluated Mr. Riley at the Federal Medical Center located in Lexington, Kentucky (FMC Lexington). Dr. Boutwell completed a report regarding her observations on July 17, 2015.[7] Dr. Boutwell met with Mr. Riley four times during

---

[7] On June 4, 2015, the Court granted a request from the Warden at FMC Lexington for an extension of time to complete Mr. Riley's mental health evaluation. The Court asked that the

his confinement, and she observed him more frequently. (*See* Sealed Doc. 15; August 4, 2015 Tr. pp. 11-12, 27).

16.　According to Dr. Boutwell's report, Mr. Riley was guarded during intake but exhibited few psychological symptoms; he appeared "fairly well adjusted" when he arrived at FMC Lexington. (Sealed Doc. 15, p. 4). Over time, Mr. Riley experienced "a greater number of mental health symptoms." (*Id.*). Mr. Riley "displayed significant delusional beliefs, including paranoid thoughts," but he "adamantly denied a need for psychiatric medication." (*Id.*). Although Mr. Riley initially was "very guarded and defensive, [] once he learned that FMC Lexington is not an inpatient psychiatric facility, he appeared to relax." (*Id.*). Mr. Riley's "speech remained organized and goal-directed, but he demonstrated impairment in the content of his speech, which appeared delusional in nature." (*Id.*). Mr. Riley "voiced paranoia," and "believed that he was unjustly persecuted by the federal government." (*Id.* at 5). Dr. Boutwell explained:

> [Mr. Riley] also went on to describe how an individual 'high up' in the federal government (he implied the President or perhaps the Attorney General) was attempting to 'get back' at him because he once dated his daughter, who is of a different race than his own. He implied a larger conspiracy designed to 'get back' at him because of his former relationship, noting the mother of his former girlfriend used to be the governor of New Jersey. He also stated that he wants the government 'to pardon me for the all the wrongs I've done in my life – I'm asking for my life to be clean.'

---

facility complete its evaluation by June 19, 2015 and provide the Court a report on or before July 17, 2015. (Doc. 12).

10

(*Id.* at 5).

17. Towards the end of the evaluation period, Dr. Boutwell observed Mr. Riley "wearing ear plugs in his ears at all times." (Sealed Doc. 15, p. 5). Mr. Riley explained that he wore ear plugs "to help keep noise out." (*Id.*). He denied experiencing auditory hallucinations, but according to Dr. Boutwell, "ear plugs are a fairly common method utilized by individuals experiencing auditory hallucinations who are attempting to 'block out' the voices." (*Id.*). Dr. Boutwell acknowledged that some inmates use ear plugs to block out noise from loud prison environments. Mr. Riley testified that he wore ear plugs throughout much of his incarceration for that very purpose. But Dr. Boutwell noted that Mr. Riley wore ear plugs during their meetings in Ms. Boutwell's office, which was quiet at the time. During the August 4, 2015 hearing, Mr. Riley was wearing one ear plug. Mr. Riley explained that he wears ear plugs for different reasons.

18. Dr. Boutwell administered the Wechsler Adult Intelligence Scale – Fourth Edition test (WAIS-IV) to assess Mr. Riley's overall cognitive and intellectual functioning. Scores of 100 are considered average. Most individuals score between 85 and 115. The test produces four scores, each of which measures a different facet of intelligence. (Sealed Doc. 15, p. 5). Mr. Riley scored a 93 on the Verbal Comprehension Index portion of the test, which is in the average range of functioning. The Verbal Comprehension Index measures acquired knowledge,

verbal reasoning, and comprehension of verbal information. Mr. Riley scored a 115 on the Perceptual Reasoning Index portion of the test, which is in the high range of functioning. The Perceptual Reasoning Index measures perceptual organization, visual processing, nonverbal reasoning, spatial processing skills, and attention to detail. Mr. Riley scored a 95 on the Working Memory Index portion of the test, which is in the average range of functioning. The Working Memory Index measures short-term auditory and immediate memory, numerical reasoning ability, and mental computation. And Mr. Riley scored a 92 on the Processing Speed Index portion of the test, which is in the average range of functioning. The Processing Speed Index measures speed of mental operation, psychomotor speed, visual memory, and visual-motor integration. Based on these test results, Dr. Boutwell determined that one of Mr. Riley's strengths is his ability to think abstractly and to solve abstract problems. (Sealed Doc. 15, p. 5).

19.   Dr. Boutwell also administered the Minnesota Multiphasic Personality Inventory, 2nd Edition, Restructured Form test (MMPI-2-RF). This test measures psychological symptoms and is designed to provide information regarding an individual's interpretation of psychological problems that the individual may be experiencing. (Sealed Doc. 15, pp. 5-6). The test contains 338 true/false questions. Mr. Riley responded consistently and did not exaggerate or over-report. Mr. Riley presented himself in a positive light, and he denied minor faults and

shortcomings that most individuals acknowledge. According to Dr. Boutwell, "while such results could reflect a background stressing conventional values, it is uncommon, and means that any absence of elevation should be interpreted with caution." (*Id.* p. 6). Based on Mr. Riley's apparent under-reporting, Dr. Boutwell opined that Mr. Riley "experiences an even greater magnitude of thought dysfunction than he reported on the MMPI-2-RF." (*Id.*). According to Dr. Boutwell, "[t]hese results validate and substantiate the presence of significant delusional beliefs." (*Id.*).

20. During the examinations, Mr. Riley did not report "any somatic or cognitive symptoms, any emotional problems, any behavioral problems, or any difficulties in interpersonal relationships." (*Id.*). But Mr. Riley did report "prominent persecutory beliefs that likely rise to the level of paranoid delusions, including a strong belief that others seek to harm him." (*Id.*). Dr. Boutwell concluded that Mr. Riley likely will "present as suspicious and distrustful" and "experience serious interpersonal problems as a result of these issues." (*Id.*).

21. Based on her evaluation of Mr. Riley, Dr. Boutwell diagnosed Mr. Riley with unspecified schizophrenia spectrum and other psychotic disorder. (*Id.*). Dr. Boutwell concluded that Mr. Riley's "psychotic disorder precludes his ability to apply information [about court proceedings] in a rational manner to his own case, or to properly assist in his defense." (Sealed Doc. 15, pp. 7-8). Dr. Boutwell

concluded that Mr. Riley's prognosis is "guarded." (*Id.* at 8). Dr. Boutwell recommended that the Court commit Mr. Riley for treatment pursuant to 18 U.S.C. § 4241(d) for a period of competency restoration treatment at a federal medical center. Dr. Boutwell also recommended that the Court add mental health provisions to the conditions of Mr. Riley's release and that the Court monitor his psychiatric condition and medication compliance when Mr. Riley returns to supervised release. (*Id.* at 8-9).

22. After receiving Dr. Boutwell's report, the Court conducted a competency hearing on August 4, 2015. Dr. Boutwell testified during the hearing, and Mr. Riley participated fully in the hearing. For example, Mr. Riley explained to the Court why he believes he has not violated the original conditions of his supervised release. Mr. Riley presented to the Court a timeline and a description of the events that led to the Court's initial hearing on April 8, 2015. (August 4, 2015 Tr. pp. 29-32, 39). Mr. Riley appropriately expressed confusion over why Mr. Worboys originally told Mr. Riley that this Court would not have jurisdiction over a hearing concerning his supervised release when Mr. Riley had been living in Alabama and working with Mr. Worboys since 2013. (August 4, 2015 Tr. pp. 29-31).

23. During the August 4, 2015 hearing, Mr. Riley reminded the Court about his civil lawsuit challenging the validity of medical records from his stay at

FMC Rochester. (August 4, 2015 Tr. pp. 32-35). Mr. Riley is representing himself in that civil action. When a district court judge dismissed that case after Mr. Riley failed to respond to a show cause order, Mr. Riley filed a motion asking for an extension of time to respond to the show cause order. (Doc. 5 in Case No. 5:15-cv-00587-CLS). The Court granted Mr. Riley's motion for additional time to respond to the show cause order. On August 4, 2015, Mr. Riley filed a second motion for an extension of time. (Doc. 9 in Case No. 5:15-cv-00587-CLS). In his motions, Mr. Riley articulately presented his arguments in support of his position.

## II. Findings of Law

Under 18 U.S.C. § 4241, a criminal defendant or an attorney for the government may file a motion to determine the defendant's competency "[a]t any time after the commencement of probation or supervised release and prior to the completion of the sentence. . . ." 18 U.S.C. § 4241(a). The Court must grant the motion "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *Id.* Following a psychiatric or psychological evaluation, the Court must conduct a competency hearing. *Id.* at § 4241(b)-(c). "If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a

mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General" for "treatment in a suitable facility." *Id.* at § 4241(d).

On the record in this case, the Court finds by a preponderance of the evidence that Mr. Riley presently suffers from a mental disease or defect. Dr. Boutwell diagnosed Mr. Riley with unspecified schizophrenia spectrum and other psychotic disorder. (Sealed Doc. 15, p.p. 6-7). Mr. Riley's statements at the two hearings in this matter are consistent with Dr. Boutwell's determination that Mr. Riley likely suffers from paranoid delusions and from auditory hallucinations.

Although the Court finds that Mr. Riley presently suffers from a mental impairment, the Court does not find by a preponderance of the evidence that Mr. Riley's mental disease or defect renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. As discussed in paragraphs 11-13 and 23-24 above, during the April 8, 2015 and August 4, 2015 hearings in this matter, Mr. Riley assisted his attorney and offered thoughtful, organized arguments to supplement his attorney's arguments. Mr. Riley's ability to prepare and file

civil motions suggests that Mr. Riley can understand the nature of and assist in the legal proceedings in which he is involved.

A number of Dr. Boutwell's findings support the Court's decision. Dr. Boutwell observed that Mr. Riley has "an adequate understanding of basic legal concepts" and "demonstrated no deficits in that regard." (Sealed Doc. 15, p. 7). Specially, Dr. Boutwell noted:

> Mr. Riley was able to describe various plea options, including guilty and not guilty. He stated a guilty plea is when a defendant admits he committed the alleged offense, and is followed by sentencing. He stated a not guilty plea is when an individual says he or she did not commit the crime, and is followed by a trial. He was aware of a plea agreement, stating it involved an agreement between the defendant and the prosecutor in which the defendant pled guilty in order to receive a reduced sentence. He understood a defendant gave up his rights when accepting a plea bargain, including the right to trial. Mr. Riley recognized the adversarial nature of courtroom proceedings. He was aware that the prosecutor is not on a defendant's side, and attempts to prove the case against a defendant in order to secure a conviction. He stated that the Judge is the "overseer of the Court," and is neutral. He stated he participated in a trial prior to his conviction on the instant offense. He understood a jury is comprised of 12 individuals from the community who make a decision about guilt after hearing information presented by both sides in court. He was aware a jury must be unanimous in their verdict. He understood he was not required to testify, and understood he would be cross-examined by the prosecutor if he chose to testify. He understood witnesses are expected to tell the truth in court, and can receive sanctions if they commit perjury. He was aware of the type of behavior expected of him in court, and stated he could speak when asked to do so by the Judge.
>
> . . .
>
> Mr. Riley was aware that his role is to be open and honest with his attorney, and he was aware that such communications are privileged.

17

. . .

(Sealed Doc. 15, p. 9).

Pursuant to 18 U.S.C. § 4246, the Court considered whether the record contains clear and convincing evidence that Mr. Riley's mental disease or defect "would create a substantial risk of bodily injury to another person or serious damage to property of another. . . ." 18 U.S.C. § 4246(d). The Court finds that the record does not support such a finding. Dr. Boutwell did not observe or receive reports that Mr. Riley engaged in behavior that would pose a physical danger to himself or others. (August 4, 2015 Tr. pp. 16-17). When Ms. Davis communicated with Mr. Worboys in late 2014 and early 2015, she did not reference any specific threats that Mr. Riley made to her. (April 8, 2015 Tr. p. 7). During Mr. Gurley's March 30, 2015 meeting with Mr. Riley, Mr. Riley did not make threats to harm himself or anyone else. (April 8, 2015 Tr. p. 17). Based on the Court's observations of Mr. Riley during the two hearings conducted as part of these proceedings, the Court has no independent reason to believe that Mr. Riley's mental disease or defect creates a substantial risk of bodily injury to another person or serious property damage of another.

Because the Court finds that Mr. Riley suffers from a mental disease or defect, the Court adds the following special condition to Mr. Riley's conditions for supervised release:

> Mr. Riley shall participate in a mental health treatment program under the administrative supervision of the probation officer. Such mental health program may include, upon recommendation of the mental health treatment providers, any of the following: inpatient treatment, outpatient treatment, day treatment, and/or community residential treatment. Mr. Riley shall take all medication prescribed as part of his mental health treatment appropriately and, if necessary, submit to monitoring to confirm the same. Mr. Riley shall provide the probation officer complete and full access to all clinicians and records pertaining to his mental health treatment. Furthermore, Mr. Riley shall contribute to the cost of treatment unless the probation officer determines that the defendant does not have the ability to do so.

This additional condition supplements the original conditions of supervised release. The original conditions of Mr. Riley's supervised release remain in effect. (*See* Doc. 1, pp. 4-5).

The Court also asks the United States Probation Office to please assign Mr. Riley's case to a new probation officer. Mr. Worboys shall no longer oversee Mr. Riley's supervised release.

### III. Conclusion

For the reasons discussed above, the Court concludes that Mr. Riley suffers from a mental disease or defect, but the mental disease or defect does not prevent Mr. Riley from understanding the nature of these proceedings or effectively assisting in his defense. Therefore, the Court **ORDERS** Mr. Riley's release from the custody of the Attorney General. **Within 48 hours of his release, Mr. Riley**

**shall personally report to the United States Probation Office, 101 Holmes Ave. NE #302, Huntsville, AL 35801.**

    **DONE** and **ORDERED** this August 17, 2015.

                                                _____
                                                **MADELINE HUGHES HAIKALA**
                                                UNITED STATES DISTRICT JUDGE